**ALGONQUIN DEEP SEA RESEARCH CORP., as Owner of the F/V ENDEAVOUR, Plaintiff, Appellant,**

v.

**PERINI CORP., as Owner of the TUG GORHAM H. WHITNEY, et al., Defendants, Appellees.**

No. 71-1158.

United States Court of Appeals, First Circuit.

Heard March 7, 1972.

Decided March 28, 1972.

Richard A. Dempsey, Boston Mass., with whom Leo F. Glynn and Glynn & Dempsey, Boston Mass., were on brief, for appellant.

Frank J. Maley, with whom Frank H. Handy, Jr., Kneeland, Splane & Kydd, Boston, Mass., and Mendes & Mount, New York City, were on brief, for appellees.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

This is a collision case, involving the F/V Endeavour, the Tug Gorham H. Whitney, and Scow No. 1501. Plaintiff, appellant, the owner of the Endeavour, brought suit against the owner of the other vessels. The district court, find-

ing the Endeavour solely at fault, dismissed the complaint. On this appeal appellant seeks to hold the other vessels solely at fault—a proposition we could not entertain [1]—or to assert a both-to-blame situation, which has arguable merit. The City of New Bedford, Massachusetts is approached through, consecutively, Fort Phoenix Reach and New Bedford Reach, the channel in both being 350' wide, and running northerly. Between the two, at right angles, is a hurricane barrier, or dike, about 20' high, with a gateway 152' wide and some 150' long. North of the gate New Bedford Reach runs about 9 degrees more to the west of north than does Fort Phoenix Reach. After dark, on a clear evening in January 1969, the Endeavour was bound up Fort Phoenix Reach carrying, the court found, a 2-knot tide and allegedly proceeding through the water at a reduced speed.[2] The tug was bound down New Bedford Reach attached to the after starboard side of the scow, and proceeding, she said, over the bottom against the tide at 3 knots. The combined beam of the tug and scow was 67'. The tug was showing her proper lights; the scow was carrying a kerosene lantern.[3] On his own testimony the master of the Endeavour saw no lights until, just as he was approaching the gate, he saw a lantern close ahead, 20 to 25 degrees off his port bow. No explanation is offered why he did not then see the lights of the tug.[4] He reversed his engine, but did not have time to change his course, and struck the bow of the scow somewhat obliquely as it emerged from the gate. The scow, made of steel, was not damaged.

The court found that the scow and tug were entirely on their starboard side of the channel. At essentially the last moment, her master allegedly saw the lights of the Endeavour in front of him blink once off and on.[5] He blew the danger signal and stopped his engine, but dared not reverse for fear of striking the gate. It is not seriously claimed that at this point either vessel could have avoided the collision.

The question naturally arises why the lights of each vessel were not sooner visible to the other. The Endeavour contends that the tug was so far to the west that she was "hiding" behind the dike. The reverse, if anything, is the fact, for it was the Endeavour who was on the wrong side of the channel. Cap-

---

1. There are so many possible faults that the Endeavour committed, either cumulatively or alternatively, that discussion is unnecessary.

2. Her maximum speed, according to her master, was 10½ knots, a matter he would be unlikely to misrepresent. The court did not determine her actual speed. Had it done so it would have discovered that its acceptance of the tug master's testimony, post, that when he was 200 yards from the gate he saw what proved to be the Endeavour 1000 yards on the other side, required her to be going over the bottom at 15 knots in order for them to meet at the gate. This seems hardly likely. Either the distance was wrong, or the master exaggerated his own speed.

3. Much is sought to be made by the Endeavour of the fact that the scow's lantern did not have the required five mile visibility. Since Endeavour's own expert admitted it had a two mile visibility, and since everything happened at close range on a clear night, there would seem no operative fault. In any event, since we find other fault chargeable to appellee, the matter is immaterial.

4. We have our own explanation, although it is not in accord with one of the findings, discussed post, of the district court. The court warrantably found, on the testimony of appellee's witnesses, that the tug came through the gate within a few feet of the west wall. Since the forward half of the barge was ahead, and easterly, of the tug, her bow lantern was both easterly and considerably ahead of the tug's lights. On all the evidence the Endeavour was not approaching the gate head on, but was cutting over from the westerly side of the channel. We believe that, until she cut over, all the flotilla lights were hidden from her by the dike, and that she would see the lantern first.

5. Perhaps she was passing behind the south-westerly pilings that guarded the gate? *See* n. 4, ante.

tain Silva, the master of the tug, testified that when he was 200 yards from the gate he saw the approaching lights of the Endeavour 1000 yards on the other side of the gate, on the westerly side of the channel. We question whether the Endeavour was that distant,[6] but the significant fact is that he saw her.[7] No further reference is made to her lights until he observed her, at the first time that she saw him at all, at the southern entrance to the gate.

The court found that both vessels remained in sight of each other for this full period. We find it hard to credit such gross inattention on the part of both vessels. Rather, we believe that the fact that, after Captain Silva's first sight of the Endeavour, she kept to the westerly side of the channel, as did the tug, resulted in both vessels being out of sight of each other because of the dike, until they approached the center of the channel at the gate. The nearer to the dike a vessel proceeding westerly of the opening, the more would the westerly side of the channel beyond the dike be occluded.

Such a resolution of the evidence, had the court made it, would not have relieved the tug from blame. On his own testimony, Captain Silva knew that the Endeavour was coming up the channel.

Not only were they both bound for a relatively narrow gate, but, to Captain Silva's own knowledge, the Endeavour was on his side of the channel. Acting as his own lookout, although he had other demanding and immediate concerns,[8] he forgot all about her. He should have anticipated exactly what happened and blown as he approached the gate. Inland Rules, Article 18, Rule V, 33 U.S.C. § 203.

The court's finding, that the Endeavour remained in her line of sight from the beginning, is even more unfavorable to its decision freeing the tug from fault than what we would deduce the facts to be. On that basis the tug uninterruptedly saw the Endeavour maintaining a straight course directly for her, but nevertheless proceeded ahead and gave no signal until collision was inevitable. The Endeavour's stem struck well westerly of the center line of the scow. We could not imagine a clearer case of contributory fault.[9] Gary v. United States Oil Screw Echo, 4 Cir., 1964, 334 F.2d 199; see McAllister Lighterage Line v. The Pejepscot, E.D. N.Y., 1955, 132 F.Supp. 416, 419, aff'd, 2 Cir., 243 F.2d 794; see also Bucolo, Inc. v. S/V Jaguar, 1 Cir., 1970, 428 F.2d 394. See generally, Inland Rules, Article 18, Rule I, 33 U.S.C. § 203.[10]

6. See n. 2, ante.

7. "[When I was] maybe a couple of hundred yards from the opening in the hurricane barrier I saw three lights approximately in this position with probably 1,000 yards. . . . Three lights, one white light and the riding lights of a vessel approaching. One red and one green. . . .
   "It appeared that the fishing boat was on the left side of the channel as he came up in here when I first saw him."

8. Q. "It takes some skill to get that tug, and that scow alongside through the gate, does it not?" A. "Well, I think so." Q. "And to get it lined up for the gate is the most important part of the entire procedure, is it not?" A. "It is." Q. " . . . as you were approaching the gate, you were looking at the north side of the gate and also looking at your scow to see how she was handling, as well as the tug and so forth; isn't that true?"

A. "In sequence." Q. " . . . and where you are steering in the channel and the gate?" A. "Right."

9. At oral argument appellee's counsel argued that Captain Silva kept thinking the Endeavour would eventually cross over, in time to avoid collision. This would not be an answer. But even more to the point, it was counsel's testimony, not the Captain's. It seems apparent what he was thinking about. See n. 8, ante.

10. "Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other." 33 U.S.C. § 203.

The judgment dismissing the complaint is reversed, and the case remanded to the district court with directions to award the plaintiff one half its damages.